2022 IL App (1st) 220662-U
Order filed: December 15, 2022

FIRST DISTRICT
FOURTH DIVISION

No. 1-22-0662

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| STATE FARM FIRE & CASUALTY COMPANY, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 20 CH 7447 |
| | ) | |
| ADVANCED INVENTORY MANAGEMENT, | ) | Honorable |
| INC., d/b/a eSutures.com, | ) | Anna H. Demacopoulos, |
| | ) | Judge, presiding. |
| Defendant-Appellant. | ) | |

_____

JUSTICE ROCHFORD delivered the judgment of the court.
Presiding Justice Lampkin and Justice Martin concurred in the judgment.

**ORDER**

¶ 1   *Held*: Order granting summary judgment in favor of insurer and denying partial summary judgment in favor of insured in this declaratory judgment action is reversed, and partial summary judgment is entered in favor of insured, where insurer had a duty to defend its insured in underlying litigation; this matter is remanded for further proceedings on the issue of insurer's duty to indemnify insured for underlying settlement.

¶ 2   Plaintiff-appellee, State Farm Fire & Casualty Company, filed the instant suit seeking a declaratory judgment that it had no duty to defend or indemnify defendant-appellant, Advanced Inventory Management, Inc., b/b/a eSutures.com (AIM), and others, with respect to an underlying lawsuit. The parties filed cross-motions for summary judgment, and the circuit court granted summary judgment in favor of State Farm and denied partial summary judgment in favor of AIM,

after concluding there was no duty to defend. For the following reasons, we reverse and enter partial summary judgment in favor of AIM as to State Farm's duty to defend. However, we make no finding as to State Farm's duty to indemnify AIM for a settlement paid to resolve the underlying lawsuit and remand for further proceedings on that issue.

¶ 3    The underlying suit was filed in the United States District Court for the Northern District of Illinois on June 15, 2020, by Johnson & Johnson, Ethicon, Inc., Ethicon US, LLC and Johnson & Johnson Health Care Systems, Inc., (collectively "Ethicon"). That suit was brought against AIM, three of its employees, Anthony Iaderosa, Jr., Jason Einhorn, and Michael Phipps, and a third individual, Mudassar Shah. The operative first amended complaint in the underlying suit was filed on July 31, 2020.

¶ 4    In general, the 78-page underlying complaint alleged that AIM was an Illinois-based distributer and wholesale liquidator of discounted surgical supplies. The underlying suit sought relief for AIM's alleged illegal sale and distribution of Ethicon surgical devices and other Ethicon devices that were either counterfeit, stolen, altered, expired, or misbranded. It more specifically asserted that AIM accomplished this by purchasing the counterfeited devices from a third-party, knowing that the third-party sold counterfeit devices. AIM also sold expired medical devices in counterfeit packaging, and further purchased genuine Ethicon devices from medical providers, who had procured discounted product from Ethicon while misrepresenting that the product would be used in-house and not for resale. AIM then resold those devices.

¶ 5    The underlying complaint contained 12 counts, including counts alleging trademark infringement, false description, false advertising, and dilution of mark under federal statutes. The complaint also included counts alleging violations of the Illinois Trademark Registration and Protection Act (765 ILCS 1036/1, *et seq*. (West 2020)) and the Uniform Deceptive Trade Practices

Act (815 ILCS 510/1, *et seq.* (West 2020), as well as common law claims of unfair competition, unjust enrichment, and tortious interference with contract. Finally, the underlying complaint included a count alleging breach of an earlier settlement agreement relating to the distribution of Ethicon medical devices.

¶ 6    Of note here, the underlying complaint included specific assertions that AIM improperly used, reproduced, counterfeited, copied or colorably imitated Ethicon's "Trademarks" and "Trade Dress" in "advertisements" and "in connection with the sale, offering for sale, distribution, or advertising" of Ethicon surgical devices and other Ethicon devices that were either counterfeit, stolen, altered, expired, or misbranded. AIM also allegedly used "trade dress *** which in commercial advertising or promotion, misrepresents the nature, characteristics, and qualities of the counterfeit [Ethicon] products, and the diverted Ethicon products that are materially different from authentic Ethicon products." AIM further allegedly "advertised, marketed, and promoted" Ethicon surgical and other devices that were either counterfeit, stolen, altered, expired, or misbranded "to the public, and/or to specific segments of the public, using the Ethicon Marks and Trade Dress, as well as other intellectual property belonging to Ethicon." It was also specifically alleged that these actions constituted "willful infringement" of Ethicon's "Marks and Trade Dress." The complaint generally alleged that these activities had taken place "[s]ince at least 2018."

¶ 7    State Farm insured AIM under two policies of liability insurance relevant to the underlying suit: a businessowners policy, number 93-EZ-C489-2, in effect from October 25, 2018, to October 25, 2019, and a commercial liability umbrella policy, number 93-CV-D075-6 (the umbrella policy), in effect from May 27, 2018, to May 27, 2019. Each of these policies provided liability coverage for personal and advertising injury, as well as certain relevant exclusions to that coverage. Specifically, the businessowners policy provided in relevant part as follows:

"**SECTION II – LIABILITY**

**Coverage L – Business Liability**

1.      When a Limit of Insurance is shown in the Declarations for Coverage L – Business Liability, we will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury', 'property damage' or 'personal and advertising injury' to which this insurance applies. We will have the right and duty to defend the insured by counsel of our choice against any 'suit' seeking those damages. However, we will have no duty to defend the insured against any 'suit' seeking damages for 'bodily injury' 'property damage' or 'personal and advertising injury' to which this insurance does not apply. We may, at our discretion, investigate any 'occurrence' or offense and settle any claim or 'suit' with or without the insured's consent, for any reason and at any time. But:

a. The amount we will pay for damages is limited as described in **SECTION II –LIMITS OF INSURANCE**; and

b. Our right and duty to defend end when we have used up the applicable Limit of Insurance in the payment of judgments or settlements or medical expenses.

* * *

2.      This insurance applies:

* * *

b. To 'personal and advertising injury' caused by an offense arising out of your business, but only if the offense was committed in the 'coverage territory' during the policy period.

* * *

**Section II- Exclusions**

- 4 -

Applicable to Coverage L – Business Liability, this insurance does not apply to:

\* \* \*

17.     Personal and Advertising Injury

a. Caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict 'personal and advertising injury';

b. Arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity;

\* \* \*

e. Arising out of a breach of contract, except an implied contract to use another's advertising idea in your 'advertisement.';

\* \* \*

l. Arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights. Under this exclusion, such other intellectual property rights do not include the use of another's advertising idea in your 'advertisement'.

However, this exclusion does not apply to infringement, in your 'advertisement' of copyright, trade dress or slogan.

\* \* \*

**SECTION II – DEFINITIONS**

1.     'Advertisement' means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purpose of this definition:

- 5 -

a. Notices that are published include material placed on the Internet or on similar electronic means of communication; and

b. Regarding websites, only that part of a website that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

\* \* \*

18.    'Personal and advertising injury' means injury, including consequential 'bodily injury' arising out of one or more of the following offenses:

f. The use of another's advertising idea in your 'advertisement'; or

g. Infringing upon another's copyright, trade dress or slogan in your 'advertisement'.

¶ 8    The umbrella policy provided, in relevant part:

**Coverage L-Business Liability**

1.    We will pay on behalf of the insured the 'ultimate net loss' in excess of the 'retained limit' because of 'bodily injury', 'property damage' or 'personal and advertising injury' to which this insurance applies. We will have the right and duty to defend the insured, by counsel of our choice, against any 'suit' seeking those damages when the 'underlying insurance' does not provide coverage or the limits of 'underlying insurance' does not provide coverage or the limits of 'underlying insurance' have been exhausted.

\* \* \*

2.    This insurance applies:

> b. To 'personal and advertising injury' caused by an offense arising out of your business, but only if the offense was committed in the 'coverage territory' during the policy period."

The definitions and exclusions with respect to the personal and advertising injury coverage contained in the umbrella policy are identical to those in the businessowners policy outlined above.

¶ 9    On August 4, 2020, AIM tendered the defense of the underlying suit to State Farm under both policies, and on December 2, 2020, State Farm accepted the tender and agreed to fund AIM's defense of the underlying suit through independent counsel, subject to a reservation of rights. On December 23, 2022, State Farm filed the instant declaratory judgment action against AIM, Ethicon, Iaderosa, Jr., Einhorn, Phipps, and Shah.

¶ 10    In the four-count complaint for declaratory judgment, Count I sought a declaration that Shah, one of the named defendants in the underlying complaint, was not an insured. Count II alleged that the underlying complaint failed to allege "personal and advertising injury." Count III alleged that certain policy exclusions in the policies applied to exclude coverage. Count IV alleged that there was no coverage for punitive damages. For all these reasons, State Farm asked the circuit court to declare that Shah was not an insured under the policies it issued to AIM, those policies do not provide coverage for the underlying suit, State Farm therefore had no duty to defend or indemnify AIM for the underlying suit, and State Farm was not obligated to pay any punitive damages assessed against AIM.

¶ 11    Shortly thereafter, in early 2021, the underlying suit was settled pursuant to both a confidential settlement agreement as well as a consent judgment and permanent injunction entered in federal court. Furthermore, all the defendants in this suit, except AIM, were dismissed pursuant to stipulations entered below—including Shah, who was not an insured, and Ethicon, Iaderosa, Jr.,

Einhorn, Phipps who all agreed to be bound by any judgment entered in this matter—leaving AIM as the sole defendant in this suit. AIM filed a motion to dismiss State Farm's complaint, which was denied on July 20, 2021. AIM then filed an answer, affirmative defenses, and jury demand, but State Farm's motion to dismiss the defenses and strike the jury demand was granted on December 7, 2021.

¶ 12   State Farm filed a motion for summary judgment on December 13, 2021. Therein, it contended that Counts I and IV of its complaint were moot considering the dismissal of Shah pursuant to stipulation and AIM's representation—in its answer to the complaint—that coverage for punitive damages either was not sought or was not available with respect to the now-settled underlying suit. As to the remaining two counts, State Farm contended that there was no duty to defend the underlying complaint, and therefore no duty to indemnify AIM for its settlement of the underlying suit, because the underlying complaint did not allege "advertising injury" and any possible coverage for such injury was otherwise excluded under the two insurance policies.[1] State Farm alternatively argued that even if it did have a duty to defend AIM, there was no duty to indemnify AIM for the settlement resolving the underlying suit because none of the claims AIM settled actually fell within the policies' scope of coverage. A copy of the consent judgment and permanent injunction filed in the underlying suit was attached to the motion.

¶ 13   AIM filed a response and cross-motion for partial summary judgment on February 7, 2022. Therein, AIM contended that there was a duty to defend under the "advertising injury" coverage grant in the policies because the underlying complaint included allegations of trade dress

---

[1] State Farm has never contended that the lack of a duty to defend entitled it to recover the defense costs it has already paid on AIM's behalf. State Farm has simply argued that a lack of a duty to defend in the first instance necessarily means that it cannot possibly have a duty to indemnify AIM for the underlying settlement.

infringement in AIM's advertising. AIM also challenged State Farm's reliance on policy exclusions to that coverage.

¶ 14     AIM further contended that State Farm's additional request to have the circuit court determine that it had no duty to indemnify for the settlement reached in the underlying suit was improper because there were "no allegations in State Farm's declaratory judgment complaint about the settlement and AIM has not asserted a counterclaim against State Farm for the settlement at this time. Neither the settlement agreement nor its terms are in the record." AIM further asserted that State Farm was improperly asking the circuit court to "make a finding of fact that the settlement was for conduct excluded by the policy and to conclude that AIM, which has not yet asserted a counterclaim or separate suit for recovery of the settlement payment, is required to allocate the settlement between covered and non-covered claims." As such, AIM asserted: "The Court has a record on which it can make a finding that there was a duty to defend because of the potential for coverage. State Farm's motion for summary judgment should be denied and AIM's motion for partial summary judgment should be granted on this issue. State Farm's motion for summary judgment as to the settlement should be denied."

¶ 15     After the parties fully briefed the cross-motions for summary judgment, which included State Farm filing a copy of the underlying confidential settlement agreement under seal, a hearing was held on April 18, 2022. At the beginning of that hearing, the parties and the circuit court agreed that counts I and IV of State Farm's complaint were moot and only counts II and III remained at issue. At the conclusion of the hearing, the circuit court granted State Farm's motion for summary judgment and denied AIM's cross-motion.

¶ 16     The circuit court concluded that State Farm had no duty to defend AIM in the first instance because Ethicon's injury "arises from AIM's actions of selling dangerous counterfeits" of its

products. "The fact that AIM infringed on [Ethicon's] trade dress is incidental to the actions of selling dangerous counterfeit products. The injury was not caused by the use of [Ethicon's] trade dress but rather by the sale of products with [Ethicon's] trade dress that were materially different from the authentic product and not subject to [Ethicon's] quality control measures." The circuit court further concluded that "AIM's actions constituting trade dress infringement was not a broadcast to the public about AIM's goods, products or services for the purpose of attracting customers." The circuit court also concluded that, in any case, the policy excluded any possible coverage because the underlying complaint "alleges knowing and purposeful conduct, purposeful counterfeiting of [Ethicon's] products." The circuit court did not go on to address the parties' contentions regarding the settlement of the underlying complaint, noting that "[w]here there is no duty to defend, it logically follows that there is no duty to indemnify" and therefore the court did "not need to address the issue of indemnity because there is no duty to defend." AIM timely appealed.

¶ 17    The construction of an insurance policy and the determination of the rights and obligations thereunder are questions of law for the court, and therefore the issues are appropriately addressed by way of summary judgment. *Crum & Forster Managers Corp. v. Resolution Trust Corp.*, 156 Ill. 2d 384, 391 (1993). Summary judgment is appropriate "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2–1005(c) (West 2020). Since the parties filed cross-motions for summary judgment on the issue of State Farm's duty to defend AIM, they concede that no material question of fact exists as to that issue and there is only a question of law which the court may decide based on the record. *Pielet v. Pielet*, 2012 IL 112064, ¶ 28. We review a court's decision as to cross-motions for summary

judgment *de novo*. *Home Insurance Co. v. Cincinnati Insurance Co.*, 213 Ill. 2d 307, 315 (2004).

¶ 18    Furthermore, as our supreme court has summarized:

"A court's primary objective in construing the language of an insurance policy is to ascertain and give effect to the intentions of the parties as expressed by the language of the policy. [Citation.] Like any contract, an insurance policy is to be construed as a whole, giving effect to every provision, if possible, because it must be assumed that every provision was intended to serve a purpose. [Citation.] If the words used in the policy, given their plain and ordinary meaning, are unambiguous, they must be applied as written. [Citation.] However, if the words used in the policy are ambiguous, they will be strictly construed against the drafter. [Citation.] Words are ambiguous if they are reasonably susceptible to more than one interpretation [citation], not simply if the parties can suggest creative possibilities for their meaning [citation], and a court will not search for ambiguity where there is none [citation].

To determine whether an insurer has a duty to defend its insured from a lawsuit, a court must compare the facts alleged in the underlying complaint to the relevant provisions of the insurance policy. [Citation.] The allegations must be liberally construed in favor of the insured. [Citation.] If the facts alleged fall within, or potentially within, the policy's coverage, the insurer is obligated to defend its insured. [Citation.] This is true even if the allegations are groundless, false, or fraudulent, and even if only one of several theories of recovery alleged in the complaint falls within the potential coverage of the policy. [Citation.] Thus, an insurer may not justifiably refuse to defend a lawsuit against its insured unless it is clear from the face of the underlying complaint that the allegations set forth in the complaint fail to state facts that bring the case within, or potentially within, the coverage

- 11 -

of the policy. [Citation.]" *Valley Forge Insurance Co. v. Swiderski Electronics, Inc.,* 223 Ill. 2d 352, 362-63 (2006).

It is axiomatic that "the duty to defend is broader than the duty to indemnify [and] where there is no duty to defend, there will be no duty to indemnify." *Crum & Forster*, 156 Ill. 2d at 398. The construction of an insurance contract is a question of law subject to *de novo* review. *Swiderski Electronics, Inc.,* 223 Ill. 2d at 360.

¶ 19    On appeal, the parties have limited the scope of the duty to defend question by agreeing that State Farm owed a duty to defend AIM with respect to the underlying suit—if at all—only if the underlying complaint alleged an "advertising injury" resulting from the infringement of Ethicon's "trade dress" in AIM's "advertising," and no relevant policy exclusion applied. To trigger insurance coverage for such an advertising injury, three elements must be established: (1) the insured must have been engaged in advertising activity during the policy period when the alleged injury occurred; (2) the allegations in the underlying complaint must raise a potential for liability under one of the offenses listed in the policy; and (3) there must be a causal connection between the alleged injury and the advertising activity. *Lexmark International, Inc. v. Transportation Insurance Co.*, 327 Ill. App. 3d 128, 137 (2001). As discussed above, State Farm's duty to defend is triggered if the allegations of the underlying complaint either satisfy or *potentially* satisfy these three elements. *Swiderski.,* 223 Ill. 2d at 362–63.

¶ 20    As to the first element, we begin by noting that the businessowners policy was in effect from October 25, 2018, to October 25, 2019, the umbrella policy was in effect from May 27, 2018, to May 27, 2019, and the underlying complaint—filed in 2020—generally alleged that AIM's allegedly improper activities had taken place "[s]ince at least 2018." Neither party makes any

argument that the temporal requirement that AIM's alleged advertising activity occur during the relevant policy periods was not sufficiently alleged.

¶ 21    Turning to the requirement that AIM have been engaged in "advertising activity," the policies define "advertisement" as "a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters," which includes "material placed on the Internet or on similar electronic means of communication *** about your goods, products or services for the purposes of attracting customers or supporters." The policies do not specifically define "notice," "broadcast," or "published," and therefore we look to their dictionary definitions to afford them their plain, ordinary, and popular meanings. *Id*. at 366.

¶ 22    The dictionary defines "notice" as a "warning or intimation of something: ANNOUNCEMENT" or a "written or printed announcement." Merriam-Webster Online Dictionary, https://www.merriamwebster.com/dictionary/notice (last visited November 28, 2022). The term "broadcast" means "to make widely known." Merriam-Webster Online Dictionary, https://www.merriamwebster.com/dictionary/broadcast (last visited November 28, 2022). To "publish" means "to make generally known," "to make public announcement of," or "to disseminate to the public." Merriam-Webster Online Dictionary, https://www.merriamwebster. com/dictionary/publish (last visited November 28, 2022).

¶ 23    In the underlying complaint, Ethicon specifically alleged that AIM "holds itself out as a legitimate distributor of surgical supplies. It advertises itself as the 'global online leader in providing discounted surgical supplies,' and 'a wholesale liquidator of surgical supplies & sutures from such top brands as Ethicon.' " AIM's advertising also allegedly claims that AIM " 'is a discount distributor. We purchase excess inventory, find a home for that product within the same

marketplace, and we provide it on a just-in-time basis.' " On its website, AIM allegedly advertises: "We have worked with facilities of every size, from entire hospital systems switching the brand of all their suture and endomechanicals down to veterinarians looking to sell a couple of boxes of expired sutures. *** We have been in business since 2000, and have yet to encounter a facility who has been dissatisfied with our service in any way." With respect to the surgical devices AIM sells, a promotional video on AIM's website allegedly states: "Someone is having surgery tomorrow, and that product is going in them. Every order gets treated with that type of care. And we understand that these items are needed next day. They are going into a person, and that person has a family."

¶ 24    It is apparent from these allegations that the underlying complaint sufficiently alleged that AIM engaged in advertising activity, such that the first element was satisfied. Indeed, State Farm does not raise any specific challenge to this element on appeal. The statements allegedly made in AIM's advertisements and on its website clearly constitute—or at the very least potentially constitute—public announcements, made widely or generally known, about AIM's goods, products or services for the purpose of attracting customers. Even if not made to the public at large, AIM at the very least allegedly targeted specific market segments for the purpose of attracting customers, where it claimed to have "worked with facilities of every size, from entire hospital systems *** to veterinarians. *** We have been in business since 2000, and have yet to encounter a facility who has been dissatisfied with our service in any way."

¶ 25    As to the second element, we reiterate that "the allegations in the underlying complaint must raise a potential for liability under one of the offenses listed in the policy." *Lexmark.*, 327 Ill. App. 3d at 137. As framed by the parties on appeal, the only possible way this element can be met here is if the underlying complaint alleged AIM committed the offense of infringing Ethicon's

"trade dress" in AIM's "advertisement." The polices do not define "trade dress," but it has been defined as "the overall image of a product used in its marketing or sales that is composed of the nonfunctional elements of its design, packaging, or labeling (as colors, package shape, or symbols)." Merriam-Webster Online Dictionary, https://www.merriamwebster.com/dictionary/ trade dress (last visited November 23, 2022). Courts have defined trade dress similarly, recognizing that:

> " 'The trade dress of a product is essentially "its total image and overall appearance." ' [Citation.] 'The total image of a product "may include features such as size, shape, color or other combinations, texture, graphics, or even particular sales techniques." ' [Citation.] Trade dress recognizes that the 'design or packaging of a product may acquire a distinctiveness which serves to identify the product [by the consumer] with its manufacturer or source.' [Citation.] '[A] design or package which acquires this secondary meaning, assuming other requisites are met, is a trade dress, which may not be used in a manner likely to cause confusion as to the origin, sponsorship, or approval of the goods.' "
> *Greenwich Insurance Co. v. RPS Products, Inc.*, 379 Ill. App. 3d 78, 89 (2008).

Notably, "trade dress protection may not be claimed for product features that are functional." *TrafFix Devices, Inc. v. Marketing. Displays, Inc.*, 532 U.S. 23, 29 (2001).

¶ 26    In the underlying complaint, Ethicon alleges that it uses "distinctive packaging," defined as "Trade Dress," to "distinguish" its medical devices and other products "in the marketplace." Ethicon owns that Trade Dress, which "includes the exterior and interior packaging" of Ethicon's medical devices and other products. Ethicon allegedly uses this trade dress in commerce and prominently displays it "in its advertising and promotional materials" to promote "the business and goodwill associated with" its trade dress, which "symbolize business goodwill of Ethicon and

are invaluable assets to Ethicon." "As a result of Ethicon's extensive branding, marketing, sales, and quality control efforts in the United States and around the world, patients and medical professionals expect a product of the highest safety, reliability, and quality." Considering how trade dress has been defined by the courts and liberally construing the allegations in the underlying complaint in favor of AIM, Ethicon sufficiently alleged a protectable trade dress with respect to the products at issue here.

¶ 27    We also conclude that the underlying complaint sufficiently alleged that AIM infringed on Ethicon's trade dress in its advertising, triggering State Farm's duty to defend. "Infringe" is not defined in the policy, but it has been defined as "to encroach upon in a way that violates law or the rights of another." Merriam-Webster Online Dictionary, https://www.merriamwebster.com/ dictionary/infringe (last visited November 28, 2022). As such, courts have recognized that one may not infringe on another's trade dress " 'in a manner likely to cause confusion as to the origin, sponsorship, or approval of the goods.' [Citation.]" G*reenwich Insurance*, 379 Ill. App. 3d at 89.

¶ 28    With respect to the underlying complaint, it is evident that the allegations of advertising discussed above (*supra* ¶ 23) are insufficient to satisfy the second element where they do not include specific assertions of trade dress infringement in AIM's advertising. However, those are not the only relevant allegations, as the complaint also specifically alleged that:

> "[Count Two.] In violation of 15 U.S.C. § 1114(1)(b), Defendants, independently
> and in conspiracy with one another, reproduced, counterfeited, copied, or colorably
> imitated the registered Ethicon Marks and Trade Dress belonging to Ethicon and applied
> such reproduction, counterfeit, copy or colorable imitation to labels, signs, prints,
> packages, wrappers, receptacles, or advertisements intended to be used in commerce upon
> or in connection with the offering for sale, distribution or advertising of counterfeit

[Ethicon] medical devices; in connection with the sale, offering for sale, distribution, or advertising of diverted Ethicon products that are materially different from authentic Ethicon products authorized for sale by Ethicon in the United States and that are not subject to and subvert Ethicon's quality-control measures; and in connection with such use that is likely to cause confusion, to cause mistake, or to deceive.

* * *

[Count Three.] In violation of 15 U.S.C. § 1125(a)(1)(A), Defendants, independently and in conspiracy with one another, in connection with the counterfeit [Ethicon] medical devices, in connection with stolen Ethicon devices, and in connection with the diverted Ethicon products that are materially different from authentic Ethicon products authorized for sale by Ethicon in the United States and that are not subject to and subvert Ethicon's quality-control measures, used in commerce a slogan, trade dress, word, term, name, symbol, or device, or any combination thereof, or a false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which was or is likely to cause confusion or to cause mistake, or to deceive as to an affiliation, connection, or association with Ethicon.

* * *

[Count Five.] In violation of 15 U.S.C. § 1125(a)(1)(B), Defendants, independently and in conspiracy with one another, in connection with the sale of the counterfeit [Ethicon] medical devices, and in connection with the sale of diverted Ethicon products that are materially different from authentic Ethicon products authorized for sale by Ethicon in the United States and that are not subject to and subvert Ethicon's quality-control measures, used a slogan, trade dress, word, term, name, symbol, or device, or any combination

thereof, or a false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which in commercial advertising or promotion, misrepresents the nature, characteristics, and qualities of the counterfeit [Ethicon] products, and the diverted Ethicon products that are materially different from authentic Ethicon products.

*** Defendants advertised, marketed, and promoted the counterfeit [Ethicon] products and the diverted Ethicon products that are materially different from authentic Ethicon products authorized for sale by Ethicon in the United States and that are not subject to Ethicon's quality-control measures, to the public, and/or to specific segments of the public, using the Ethicon Marks and Trade Dress, as well as other intellectual property belonging to Ethicon. [Count Five.]"

In each instance, these actions were further alleged to "constitute willful infringement of Ethicon's exclusive rights in the Ethicon Marks and Trade Dress."

¶ 29    We reiterate that the allegations of the underlying complaint must be liberally construed in favor of AIM, the facts alleged therein must only fall potentially within the policies' coverage to trigger State Farm's duty to defend, and this is true even if the allegations are groundless, false, or fraudulent. *Swiderski Electronics, Inc.,* 223 Ill. 2d at 362-63. Indeed, it is well-recognized that the "threshold that the complaint must satisfy to present a claim of potential coverage is low. Where there is doubt as to coverage, it is to be resolved in favor of the insured." *Management Support Associates v. Union Indemnity Insurance Co. of New York*, 129 Ill. App. 3d 1089, 1096 (1984). Considering these standards, the underlying complaint sufficiently alleged that AIM infringed Ethicon's trade dress in its advertising.

¶ 30    In reaching this conclusion, we necessarily reject several specific arguments raised by State

Farm on appeal. First, we reject the argument that Ethicon's complaint "essentially pled that AIM's counterfeit, misbranded and stolen products infringed on its trademarks. The complaint did not allege a trade dress claim." Clearly, the complaint did allege trademark infringement, but for all the reasons discussed above it also clearly alleged infringement of Ethicon's trade dress in AIM's advertising. At the very least, the underlying complaint contained allegations *potentially* within the policy's coverage for that injury.

¶ 31   We also reject State Farm's related argument that the underlying complaint did not assert trade dress infringement, where at most the complaint alleged AIM infringed on non-protectable "functional" portions of Ethicon's packaging as "the overall packaging of the medical devices serves a purpose other than source identification. The [Ethicon] complaint alleges that the medical devices must be packaged according to FDA regulations and that the packaging is to ensure health and safety. This feature is functional."

¶ 32   State Farm is correct that "trade dress protection may not be claimed for product features that are functional." *TrafFix Devices, Inc.*, 532 U.S. at 29. It is also true that the underlying complaint includes allegations that "Ethicon designs the products, and each product's packaging and Instructions for Use, to be in full compliance with federal regulations. *** The FDA regulates a multitude of aspects of each Ethicon medical device intended to be sold in the United States, including regulating Ethicon's processes for determining how the device is packaged, labeled, and distributed. *** The packaging and labeling are considered part of the device." At the very least, these allegations raise a question of whether the design and packaging of Ethicon's products are in fact functional, and therefore not protectable trade dress.

¶ 33   However, considering the other underlying allegations that Ethicon also uses "distinctive packaging" to "distinguish" its medical devices and other products "in the marketplace" to promote

- 19 -

"the business and goodwill associated with" its trade dress, the point is that the allegations of the underlying complaint at most leave the merits of Ethicon's claims of protectable trade dress an open question. *TrafFix Devices, Inc.*, 532 U.S. at 28 ("The design or packaging of a product may acquire a distinctiveness which serves to identify the product with its manufacturer or source; and a design or package which acquires this secondary meaning, assuming other requisites are met, is a trade dress which may not be used in a manner likely to cause confusion as to the origin, sponsorship, or approval of the goods.") Again, "the allegations of the underlying complaint must be liberally construed in favor of the insured, resolving any doubt or ambiguity about coverage against the insurer." *Nationwide Property & Casualty Insurance Co. v. State Farm Fire & Casualty Co.*, 2022 IL App (1st) 210267, ¶ 24. See also, *Illinois Tool Works Inc. v. Travelers Casualty & Surety Co.*, 2015 IL App (1st) 132350, ¶ 26 (even "vague, ambiguous allegations against an insured should be resolved in favor of finding a duty to defend"). State Farm's arguments on appeal with respect to the second element at most raise doubts as to coverage and are therefore insufficient to avoid its duty to defend.

¶ 34    We also conclude that the underlying complaint sufficiently alleged the third required element, a causal connection between Ethicon's injury and AIM's advertising activity. *Lexmark International, Inc.*, 327 Ill. App. 3d at 137. In each of the above described counts—which we have already concluded at least potentially alleged trade dress infringement in AIM's advertising— Ethicon additionally alleged that as "a direct and proximate result of Defendants' conduct, Ethicon has suffered irreparable harm to the valuable Ethicon Marks and Trade Dress and their reputation in the industry" and as "a direct and proximate result of Defendants' conduct, Ethicon has suffered damages to the valuable Ethicon Marks and Trade Dress."

¶ 35    These allegations are sufficient to satisfy the requirement that the underlying complaint at

least potentially assert a causal connection between Ethicon's injury and AIM's advertising activity. Ethicon would presumably be surprised to learn otherwise, where the prayer for relief in its underlying complaint specifically sought to enjoin AIM from "from using any of the Ethicon Marks and Trade Dress or any marks confusingly similar thereto in connection with the *** advertisement *** of medical devices" and "from using any reproduction, counterfeit, copy, or colorable imitation of any of the Ethicon Marks and Trade Dress in connection with the publicity, promotion, sale, or advertising of absorbable hemostats."

¶ 36    Having determined that the underlying complaint sufficiently alleged an "advertising injury" resulting from the infringement of Ethicon's "trade dress" in AIM's "advertising" under the polices, we must next consider if any relevant policy exclusions preclude coverage. State Farm relies upon the policy exclusions for advertising injury "[c]aused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury,' " or "[a]rising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity." State Farm's reliance upon these exclusions is unsurprising, as the underlying complaint is replete with allegations of AIM's intentional conduct and it goes to great lengths to establish that AIM "knew it was selling counterfeit Ethicon medical devices, and engaged in its counterfeiting knowingly and willfully." Furthermore, each of the counts discussed above specifically alleges that the actions alleged therein "constitute willful infringement of Ethicon's exclusive rights in the Ethicon Marks and Trade Dress."

¶ 37    However, we note that when an insurer invokes an exclusionary clause to deny coverage and its duty to defend, it bears the burden of proving the exclusion applies. *Illinois State Bar Ass'n Mutual Insurance Co.*, 2018 IL App (4th) 170548, ¶ 37. Provisions in an insurance policy

excluding or limiting coverage will be read narrowly, and the applicability of the exclusion must be clear and free from doubt. *Gillen v. State Farm Mutual Automobile Insurance Co.*, 215 Ill. 2d 381, 393-94 (2005); *Empire Indemnity Insurance Co. v. Chicago Province of the Society of Jesus*, 2013 IL App (1st) 112346, ¶ 39. " 'Absent absolute clarity on the face of the complaint that a particular policy exclusion applies, there exists a potential for coverage and an insurer cannot justifiably refuse to defend.' [Citation.] " *Lorenzo v. Capitol Indemnity Corp.*, 401 Ill. App. 3d 616, 620 (2010).

¶ 38    Despite the clear allegations of intentional conduct therein, the counts of the underlying complaint discussed above specifically allege violations of the federal Lanham Act. See 15 U.S.C. § 1114 (2020); 15 U.S.C. § 1125 (2020). Courts have repeatedly recognized that because there is no requirement to prove intentional conduct to establish a violation of the Lanham Act, the two specific policy exceptions relied upon by State Farm do not negate an insurer's duty to defend even in the face of allegations of intentional conduct. *Central Mutual Insurance Co. v. StunFence, Inc.*, 292 F. Supp. 2d 1072, 1082 (N.D. Ill. 2003) (collecting cases recognizing that intentional and willful conduct on the part of the insured need not be proved to recover under the Lanham Act; therefore, the exclusions for knowing violation and intent to injure as well as knowledge of falsity do not apply to negate an insurer's duty to defend). Pursuant to this caselaw, we reject State Farm's reliance upon these two exclusions to defeat its duty to defend AIM with respect to the underlying suit. *Swiderski Electronics, Inc.,* 223 Ill. 2d at 363 (duty to defend triggered even if only one of several theories of recovery alleged in the complaint falls within the potential coverage of the policy.)

¶ 39    In sum, for the forgoing reasons we conclude that State Farm did have a duty to defend AIM in the first instance, and therefore State Farm's duty to indemnify AIM for the settlement of

the underlying suit cannot be determined solely on that basis. We therefore reverse the order granting State Farm's motion for summary judgment and denying AIM's cross-motion for partial summary judgement, and grant AIM's cross-motion for partial summary judgment on the issue of State Farm's duty to defend.

¶ 40    Despite reaching this conclusion, we must nevertheless still address State Farm's alternative argument that even if it did have a duty to defend, summary judgment in its favor was still properly entered below where it had no duty to indemnify AIM for the underlying settlement because none of the claims AIM settled *actually* fell within the policies' scope of coverage. *Rosestone Investments, LLC v. Garner*, 2013 IL App (1st) 123422, ¶ 23 (appellate court may affirm a ruling on a motion for summary judgment on any basis found in the record).

¶ 41    While it is true that we may affirm the decision of the circuit court for any reason appearing in the record, we are not required to search the record for reasons to affirm. *Dunlap v. Illinois Founders Insurance. Co.*, 250 Ill. App. 3d 563, 569-70 (1993). See also, *Pepper Construction Co. v. Palmolive Tower Condominiums, LLC*, 2016 IL App (1st) 142754, ¶ 81 (appellate court's function "is to review rulings and judgments of the circuit courts and generally we will not pass on any question as to which the circuit court failed to make a decision"). In some circumstances, our review of the circuit court's decision should be limited to the issues the circuit court actually addressed and decided, and in those circumstances it may be more prudent to remand the matter to the circuit court to consider and rule upon any further issues in the first instance. *Dunlap*, 250 Ill. App. 3d at 569-70; *Ward v. Hilliard*, 2018 IL App (5th) 180214, ¶ 56; *Garrido v. Arena*, 2013 IL App (1st) 120466, ¶ 33. We believe that this appeal presents such a circumstance.

¶ 42    AIM strenuously argued below and on appeal that the issue of State Farm's duty to indemnify AIM for the underlying settlement was not properly raised below and should not be

addressed because there were "no allegations in State Farm's declaratory judgment complaint about the settlement and AIM has not asserted a counterclaim against State Farm for the settlement." In addition, both below and on appeal, the parties have debated the following issues with respect to State Farm's duty to indemnify AIM for the underlying settlement: (1) the meaning and significance of the terms contained in the confidential settlement agreement and the publicly filed consent decree, (2) whether AIM settled the underlying suit in reasonable anticipation of liability, and (3) whether and how the underlying settlement must be apportioned between settled claims that were covered by insurance and those that were not.

¶ 43    The circuit court did not address any of these issues below, specifically noting that "[w]here there is no duty to defend, it logically follows that there is no duty to indemnify" and therefore the court did "not need to address the issue of indemnity because there is no duty to defend." In light of the record and the above cited authority, we decline to address and decide State Farm's alternative argument for the first time on appeal and therefore remand for further proceedings.

¶ 44    For the foregoing reasons, the judgment of the circuit court is reversed, and partial summary judgment is entered in favor of AIM as to State Farm's duty to defend. This matter is remanded for further proceedings as to State Farm's duty to indemnity.

¶ 45    Reversed and partial summary judgment entered; cause remanded.